UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


United States of America,      )
                 Plaintiff,    )
                               )
                               )
vs.                            )      Case No. 14cr40023-TSH
                               )
                               )
Jonathan Tufts-Raymond,        )
                 Defendant.    )


BEFORE:  The Honorable Timothy S. Hillman


Sentencing


                              United States District Court
                              Courtroom No. 2
                              595 Main Street
                              Worcester, Massachusetts
                              December 10, 2014


Marianne Kusa-Ryll, RDR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
508-929-3399 justicehill@aol.com
Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    United States Attorney's Office
     Mark J. Grady, Assistant United States Attorney
3    Donohue Federal Building & Courthouse
     595 Main Street, Suite 206
4    Worcester, Massachusetts  01608
     on behalf of the Government
5
     Federal Public Defender Office
6    Behzad Mirhashem, Assistant Federal Public Defender
     District of Massachusetts
7    51 Sleeper Street, 5th Floor
     Boston, Massachusetts  02210
8    on behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Timothy S. Hillman, United States District Judge, United States District Court, District of Massachusetts, at the Donohue Federal Building & United States Courthouse, 595 Main Street, Worcester, Massachusetts, on December 10, 2014.)

THE CLERK:  All rise.

Court is now open.  You may be seated.

Case No. 14-40023, United States versus Jonathan Tufts-Raymond.

Counsel, please note your appearance for the record.

MR. GRADY:  Good afternoon, your Honor.  Mark Grady on behalf of the United States.

THE COURT:  Good afternoon, Mr. Grady.

MR. MIRHASHEM:  Good afternoon, your Honor.  Behzad Mirhashem for Mr. Tufts-Raymond.

THE COURT:  Good afternoon, Mr. Mirhashem.  And good afternoon, Mr. Tufts-Raymond.

THE DEFENDANT:  Good afternoon.

THE COURT:  All right.  So just to set the table, we are here for Mr. Tufts-Raymond -- Mr. Tufts-Raymond's sentencing -- Tufts-Raymond sentencing, and in preparation for that, I have read Ms. Roberts' as-always-excellent presentence report that was authored on November 5th and then revised on December 3rd.

1           In addition, I have received and read excellent

2    sentencing memoranda from both the government and the

3    defendant.

4           I'm unaware -- and they have attached materials to

5    each.  I am unaware of any other materials, but I want to

6    confirm the same with counsel.

7           Mr. Grady, are you aware of any additional

8    information?

9           MR. GRADY:  There -- there are no additional materials

10   submitted.  The government may allude to in its argument some

11   additional surveillance photographs or videos that are not

12   contained within the sentencing memorandum, but it would be

13   within the universe of materials described.

14          THE COURT:  Mr. Mirhashem?

15          MR. MIRHASHEM:  Nothing else.

16          THE COURT:  Anything else that you're aware of?

17          MR. MIRHASHEM:  No, your Honor.  I assume that you

18   have the four separate sets of attachments that the sentencing

19   memoranda had, the letters of support from treatment providers,

20   the letters of support from family members, and then there was

21   a photograph and a certificate.

22          THE COURT:  Yes, I have all of that.

23          MR. MIRHASHEM:  Thank you.

24          THE COURT:  And I've read all of it.

25          Okay.  Mr. Mirhashem, have you had an enough

1   opportunity to review the presentence report, and more

2   importantly, to go through it with Mr. Tufts-Raymond?

3              MR. MIRHASHEM:  Yes, your Honor.

4              THE COURT:  Mr. Tufts-Raymond, do you feel that you

5   have had enough time to digest the -- the presentence report,

6   and do you feel like you are prepared to move forward?

7              THE DEFENDANT:  Yes, your Honor, I do.

8              THE COURT:  All right.  Thank you.  You can be seated.

9              And, Mr. Mirhashem, I intend to hear from you fully,

10  but with respect to the PSR, are there any objections to the

11  factual contents that are not otherwise noted in the addendum?

12             MR. MIRHASHEM:  No, your Honor.

13             THE COURT:  And, Mr. Grady, the same question to you.

14             MR. GRADY:  No objections, your Honor.  The

15  government, I think, has reconsidered one of its positions on

16  which it sort of successfully prevailed with Probation as to

17  one count, but I'll address that in the context of I think the

18  firearm enhancement discussion.

19             THE COURT:  All right.  So let me do this.  Just to

20  continue to set the table so we can arrive at the -- the total

21  offense level, I'm going to just go through these on the

22  record, and then I know that we have a dispute on the --

23  whether or not the weapon was brandished or otherwise used, but

24  let me just set it out insofar as Ms. Roberts has, and then we

25  can go from there.

1      So with respect to Counts One and Seven, we show a

2  base offense level of 20, with an increase of five levels, a

3  specific offense characteristic increase of five levels,

4  because the firearm was brandished for an adjusted offense

5  level subtotal of 25.

6      On Counts Two, Three, Four, and Five, interference

7  with commerce by robbery, we show a base offense level of 20

8  and a specific offense characteristic increase of six levels,

9  because the firearm was otherwise used, for an adjusted offense

10  level subtotal of 26.

11      On Count Six, the armed bank robbery count, that too

12  shows a base offense level of 20, with an increase of two

13  levels for the -- to account for the specific offense

14  characteristic that the property of a financial institution was

15  taken, and that shows an adjusted offense level subtotal of 22.

16      And then finally, on Count Eight, we show a base

17  offense level of 20, specific offense level characteristic

18  of -- increase of two because the property of a financial

19  institution was taken, and the contested issue of whether the

20  firearm was otherwise used or brandished, which would make the

21  specific offense level either five, if it was brandished, or

22  six, if it was otherwise used.  As it stands right now, it is

23  an adjusted offense level of 28.

24      So the -- the multiple-count adjustment would show a

25  total number of units of 7.5.  The greater of the adjusted

1   offense level is 28 at the moment.  An increase in offense

2   level of five and a combined adjusted offense level of 33, and

3   from that there's an acceptance of responsibility deduction of

4   two levels.

5        And I understand there's a third-level motion from the

6   government?

7        MR. GRADY:  Yes, your Honor.  The government would so

8   move at this time.

9        THE COURT:  All right.  If those calculations don't

10  make your head hurt something's not right.

11       All right.  Let me hear -- Mr. Mirhashem, this was --

12  let me start with you because you're the one who -- who raised

13  this.

14       MR. MIRHASHEM:  Okay.  So the issue, as your Honor is

15  aware, is this distinction between brandishing and otherwise

16  used, and it only matters as to Count Eight because the highest

17  offense level drives the total offense level.  So my argument

18  is focused on that.

19       Basically, the government says it's otherwise used if

20  you physically -- if you threaten a specific person, and if

21  they're right about that, any time you threaten a specific

22  person it's otherwise used then the government prevails on this

23  argument.  And I just want to explain why specific in this

24  context, whatever it means, and I think it's hard to understand

25  clearly what it means, can't just mean a specific person.  And

1     to appreciate that I would suggest that here you have the Court

2     of Appeals interpreting a particular guideline provision in the

3     context of particular facts so you should start with the

4     language of the guideline itself.  And so I want to start with

5     the language of brandishing and otherwise used.  And

6     brandishing is in Check 1B1.1 subsection (C) --

7                THE COURT:  Section 1. -- slow down.  Which?

8                MR. MIRHASHEM:  1B1.1.

9                THE COURT:  Yeah.

10               MR. MIRHASHEM:  And then subsection (C).

11               THE COURT:  1B.

12               MR. MIRHASHEM:  Unless I -- did I copy it wrong?

13               THE COURT:  1B.1.1?

14               MS. ROBERTS:  Your Honor, it's on page 17, subsection

15    (C).

16               THE COURT:  Yeah.  Got it.  Thank you.

17               MR. MIRHASHEM:  So the part of the -- I'm just going

18    to read the part of the definition that matters in this case:

19    "Brandished" with reference to a firearm means that all or part

20    of the weapon was displayed in order to intimidate another

21    person.  That's all in there.  If you use a firearm, display

22    it, intimidate another person, that's brandishing.

23               I mean whatever the Court of Appeals has said, it

24    surely did not intend to say the guideline doesn't say what it

25    means.  So use a firearm to -- I shouldn't use the use -- if

1  you display a firearm in order to intimidate another person

2  that's brandishing.

3        Now, "otherwise used."  So what does "otherwise used"

4  mean?  I think that to -- you have to -- the first thing I

5  always wonder about this odd phrase is otherwise -- other than

6  what?  And so you have to go to the guideline in which this is

7  used.  For example, the robbery guideline.  If you look in the

8  robbery guideline, you see that the greatest number of points

9  is assigned for actually discharging the firearm.  The next is

10  otherwise used.  Then it's brandishing.  So it's to use it

11  other than by discharging it.  So it's very close to discharge.

12  And then the language there is "to otherwise use a firearm."

13  It's in the same set of definitions basically.  It means

14  conduct did not amount to discharge but was more than

15  brandishing.  So this is where it gets difficult.  You know,

16  brandishing is precisely defined, and then if it's more than

17  that, but not discharged, it's otherwise used.

18        THE COURT:  So in the photograph, even though -- I

19  mean it's admittedly resting on the counter.

20        MR. MIRHASHEM:  Right.

21        THE COURT:  It's clearly aimed at the teller --

22        MR. MIRHASHEM:  And so --

23        THE COURT:  -- and the barrel is pointing right at

24  her.

25        MR. MIRHASHEM:  I -- I agree with the barrel is

1   pointing at her, and that doesn't settle the question of is

2   that displaying it in order to intimidate the teller.  That's

3   brandishing.  Or is it more than that?  And that's where I

4   think you have to look at the language that the Court of

5   Appeals uses in the context of those cases.

6           So in the *LaFortune* case, and that is why I quoted

7   extensively from it.  In this case, and I'm quoting directly,

8   *"LaFortune* contends that his waving and pointing of the silver

9   revolver at bank tellers and customers, together with his

10  instructions that persons in the bank get down, without an

11  explicit threat to any person constitutes brandishing."  So

12  that's his position.

13          The government contends that when *LaFortune* pointed a

14  cocked gun at the head of the female teller, held the gun in

15  his hand while shoving the customer to the floor, ordering by

16  yelling at her to get down, don't talk, and aiming the weapon

17  directly at another bank employee while giving orders, it

18  constituted an otherwise use.  This is a far cry from just

19  pointing the firearm while it's resting as in that picture.

20          And so then the Court goes on to say, As we -- "As we

21  view it, a person may brandish a weapon to advise those

22  concerned that he possesses the general ability to do

23  violence."  It's not general as opposed to a number of people

24  versus specific one person.

25          THE COURT:  You know, I have to just parenthetically

1    say that is so politely phased -- I mean phrased to a moment

2    that must have been extremely terrorizing for whoever is on the

3    receiving end of it.

4            MR. MIRHASHEM:  Well, your Honor --

5            THE COURT:  I'll give him credit for wordsmanship.

6            MR. MIRHASHEM:  You know, I can't -- when I'm reading

7    it --

8            THE COURT:  I know that.

9            MR. MIRHASHEM:  There's a quote, "advises" in quotes.

10   You know, the Court is using "advise" in quotes.

11           So a general or even pompous showing of weapons

12   involving what one -- what one would consider an arrogant

13   demonstration of their presence constitutes the generalized

14   warning that these weapons may be in the future used and not

15   merely brandished.

16           Altering this general display of weaponry by

17   specifically leveling a cocked firearm at the head or body of

18   the bank teller, or customer, ordering them to move or be quiet

19   according to one's direction is a cessation of "brandishing"

20   and the commencement of "otherwise used."  Commencement of it.

21   The "otherwise used" begins when you specifically level a

22   cocked firearm at the head of a teller and then tell people to

23   move and otherwise be quiet.  They call that the commencement.

24           And then if you look at the *Villar* case, these are the

25   facts of that case:  A teller was returning from her lunch

1    break when a man wearing a hooded sweatshirt and ski mask

2    jumped over the chain-link fence, stuck something against her

3    side, and told her to get inside the bank.  The man had a

4    Hispanic accent.  He told the teller to remain quiet and no one

5    would get hurt.  Eventually, the teller saw the man was holding

6    a gun.  Once inside the bank, the teller saw her assailant was

7    not alone.  Another man who was white was asking tellers to put

8    money inside a bag.  The Hispanic robber holding the gun

9    pointed it at another teller, who was hiding underneath her

10   desk, and told her to stand in the middle of the bank lobby.

11   Later he told the two tellers to get down on their knees before

12   both men fled the bank.

13        And in this context, the Court says this specific use

14   of the weapon can make an unmistakably clear and specific

15   threat falls within the definition of otherwise used.  So the

16   test is not are you generally pointing at a bunch of people, or

17   pointing at a specific person.  That argument is flatly and

18   consistent with the text of the guidelines.  It's whether you

19   specifically use the firearm to make a specific threat that not

20   only you better give me this money, or there's this generalized

21   concern about violence, but right here and now you may get

22   shot.  You stick it in their side, you put it to their head,

23   and I'm not saying the Court doesn't say you have to stick it

24   in their side or put it to their head.  Obviously, there's a

25   definition that applies to a number of fact patterns, but it

1   has got to be more than brandishing, and these examples they

2   said are the commencement of use other than by discharge.  And

3   that's why this case where you have the gun resting on the

4   counter does not rise to the level of otherwise used.

5            THE COURT:  Thank you.

6            MR. MIRHASHEM:  Thank you.

7            THE COURT:  I may loop back to you.

8            Let me hear from Mr. Grady.  I think I'll give you --

9   just give me one second.

10           MR. GRADY:  Sure.

11           (Pause.)

12           THE COURT:  Okay.  Go ahead.

13           MR. GRADY:  I think I would simplify things a great

14   deal, your Honor.  There are two definitions provided.

15           THE COURT:  That would be contrary to the sentencing

16   guidelines, but let's try that.

17           MR. GRADY:  One is to discharge the weapon, and there

18   really can be no dispute about that.  The gun is discharged.

19   That is the top level.  So below that begins "otherwise used,"

20   and the question then becomes where's the bottom end of that

21   range.  And the answer is where brandishing ends.

22           Nowhere -- I think contrary to what's being argued by

23   counsel -- nowhere in brandishing does it suggest in the

24   definition of the guidelines that brandishing encompasses

25   pointing a loaded weapon at an individual.  What it says is the

1    general display.  So imagine a gun.  I have a gun.  That is a

2    general display.  Holding a gun in one's waistband and lifting

3    one's shirt to make the person aware of the weapon and its

4    possible use in the future, but what the First Circuit said,

5    and I'll quote from *Villar* at 586 F.3d, page 90, quote -- and I

6    would note with respect to *LaFortune*, counsel spent a

7    tremendous amount of time arguing from that.  That case was

8    actually decided under a prior version of the guidelines that

9    was different than the guidelines in effect now.  So -- and the

10   First Circuit notes this in *Villar*.

11           THE COURT:  Is that in *Villar* an issue?

12           MR. GRADY:  They're definitionally different, and I

13   don't think it's a huge issue, but I think the First Circuit

14   even recognized this in *Villar* that *LaFortune* addressed the

15   guideline that was a different guideline than the one in effect

16   at the time of *Villar*, and that is in effect now, and I think

17   that matters because I think that to the extent *LaFortune* is

18   different from *Villar*, *Villar* ought to be the one that controls

19   because that's actually addressing the guidelines that is

20   currently in effect.  Quoting from *Villar* at page 90, quote,

21   "The *LaFortune* court focused on the, quote, specific leveling

22   of a weapon at another person, as opposed to a general display

23   of weaponry as the demarcation between brandishing and

24   otherwise using."

25           I don't think I can say it any better or more simply

1  than that.  The First Circuit has said *LaFortune*, and in this

2  case we are focusing on the demarcation line between

3  "brandishing" and "otherwise used" being the specific leveling

4  of a weapon at another person, and that's exactly what we have

5  here.  That's exactly what the government has focused its

6  argument on, and that's exactly what I think there is literally

7  no possible factual dispute regarding.  If one looks at the

8  various pictures, but I'll go to Count Eight because that is

9  the -- really the -- the count that matters.  What we have is a

10  picture of an individual --

11         MR. MIRHASHEM:  I'm sorry.  I'm just not getting that

12  on the screen.

13         MR. GRADY:  I will --

14         MR. MIRHASHEM:  You turned it on?

15         MR. GRADY:  I did.

16         MR. MIRHASHEM:  I can just come over.  I mean, I have

17  the picture.

18         MR. GRADY:  No, it's fine.  I can get more than one

19  on.

20         THE COURT:  How do you turn that on?

21         MR. MIRHASHEM:  I tried pressing.

22         MR. GRADY:  It always seems to come up when I'm on a

23  roll, your Honor.

24         But what we have here is a defendant -- this

25  defendant, Mr. Tufts-Raymond, holding a firearm whose -- and

1    this isn't a general display of a firearm where the pointy end

2    where the bullet comes out happens to be pointed at a person.

3    This is the specific leveling of a weapon at the teller with

4    the intent to communicate to the teller that if you do not do

5    what I want, this gun is going to be fired at you.  There is no

6    other way to interpret that, your Honor.

7           One can clearly see the barrel of the firearm, and

8    drawing a line from that barrel to where the teller is

9    standing, it is clearly pointed in this direction.

10          In addition, one can see the positioning of the

11   defendant's fingers.  And if that finger is not on the trigger,

12   it is on the trigger guard.  It is in -- I think it's inside

13   the trigger guard.  His finger is poised to fire the gun.  That

14   is a specific threat to a specific individual by leveling a

15   firearm at them, your Honor.  And I think there's no other way

16   to construe that photograph, and I think since this is the only

17   real material dispute in terms of the guidelines, your Honor, I

18   won't focus on the additional argument.  So I would point out

19   in addition to this, the government did include a statement

20   from the victim in which the victim was asked, Can you describe

21   in as much detail what occurred today as to the attempted

22   robbery.

23          And just skipping ahead to where the red arrow points,

24   quote, he lifted up his shirt and pointed a gun at me.  There

25   is no confusion in the victim's mind there.  "Pointed a gun at

1    me," not generally waved it around or brandished it or made a

2    general display of some potential future threat of the use of

3    the weapon.  He pointed the gun at me.

4         For those reasons, your Honor, the government believes

5    that the six-level adjustment is appropriate.

6         THE COURT:  Thank you.

7         MR. MIRHASHEM:  May I just respond to one point, your

8    Honor?

9         THE COURT:  Of course you can.

10        MR. MIRHASHEM:  Just that the government suggested

11   that the change in language from *LaFortune* makes a difference.

12   I just want to point out the First Circuit specifically held

13   that it's applying the *LaFortune* standard.  As I cite in my

14   memorandum, 586 F.3d at 89, the Court noted that the definition

15   had changed.  Then it said both parties in the case said the

16   same standard is still applied, and then the Court itself

17   applied the same standard.  So it concluded that the change in

18   the definition did not affect the analysis, and that's right in

19   the opinion, because I mean, obviously, the definition has

20   changed.  They're citing *LaFortune* so there's this issue of

21   should we be citing it or not, and so they address that in

22   their opinion.  So that's addressed by the Court, and so

23   *LaFortune* and *Villar* are authority of equal weight in this

24   case.

25        I also would say that, again, the government says that

1    brandishing, you know, involves a general display.  And nothing

2    in the definition says that it involves pointing at a specific

3    person.  Again, "brandish" means the weapon was displayed to

4    another person in order to intimidate that person.  So it's

5    not -- the distinction is not between a group of people and one

6    person.  The distinction is between displaying a weapon or

7    doing more with the weapon that rises to a level that takes you

8    outside the scope of brandishing and into using it other than

9    by discharging it.  And the examples of the facts in those

10   cases show you what the Court means by that.  It's the --

11   it's -- it was a display to intimidate, or was it more than a

12   display to intimidate.

13             THE COURT:  Well, I mean -- I think each of the three

14   categories is -- is intended to intimidate.  There's no dispute

15   about that.

16             MR. MIRHASHEM:  A specific person also, I mean I think

17   that's what I'm trying to emphasize, intimidate a person.

18             MR. GRADY:  That's not disputed, your Honor.

19             THE COURT:  Yeah, I agree.

20             MR. GRADY:  The difference --

21             THE COURT:  So if the question is the act of pointing

22   the gun, and I mean pointing the gun.  Even though it's

23   resting, it's being pointed.  I mean I think that -- I mean I

24   respectfully disagree with you on this.  You know, as always,

25   you've done a terrific job on this issue, and I've spent a lot

1    of time today working on this, but I just don't agree with you.

2    I think it was otherwise used.  I -- I agree with the

3    government that it was deliberately pointed, and it was

4    intended beyond the "brandishment" definition.

5         MR. MIRHASHEM:  I understand, your Honor.

6         THE COURT:  All right.  Okay.  So that would

7    make -- that would make the guideline provisions 135 to 168

8    months; supervised release two to five years; probation,

9    ineligible; fine range, 15,000 to 150; a restitution number of

10   $10,113.27; and a special assessment of $900.  I also show the

11   defendant in a Criminal History Category IV.

12        All right.  So Mr. -- actually, Mr. Grady, let me hear

13   you first.

14        MS. ROBERTS:  I just want to clarify that the range is

15   135 to 168 on Counts One through Eight; but Count Nine carries

16   the 84 month consecutive.

17        THE COURT:  Oh, right.  Thank you.  Thank you.  It's

18   right here in front of me.  Thank you for that.

19        Mr. Grady, let me hear from you first.

20        MR. GRADY:  Thank you, your Honor.

21        MR. MIRHASHEM:  "Consecutive," is that what he said?

22        THE COURT:  Yes, 84 months.

23        MS. ROBERTS:  Yeah, 84 months.

24        MR. MIRHASHEM:  84, sorry.

25        MR. GRADY:  Your Honor, I think though the Court has

1   read the PSR, merely reading it is a bit dry, and I would like

2   to go through the facts a little bit with some exhibits

3   outlining how these events occurred.

4        We are before the Court because this defendant over a

5   five-week period in October and November of 2013 essentially

6   engaged in a one person crime spree and committed eight armed

7   robberies of five grocery stores, two banks, and a jewelry

8   store beginning on October 30th.

9        On that day the defendant walked into the Price

10  Chopper supermarket in Worcester.  He approached the customer

11  service desk, as can be seen in Exhibit 3, asked for a plastic

12  bag and were told that they didn't have any.  The defendant

13  pulled the gun, pointed it at her as one can see from the two

14  photos, and again these are -- if one traces the line of where

15  the gun is pointed, it's directly at the teller.  Again, that

16  would be the basis for the government's contention the gun was

17  otherwise used and is charged as being material stating "give

18  me all the large bills, 100s, 50s and 20s," and he fled the

19  store with approximately $1,200.

20        Moving on to Count Two, on October 31st, the very next

21  day, at approximately 6:30 p.m., the defendant entered the

22  Stop & Shop on West Boylston Street in Worcester.  He

23  approached the customer service desk and told the victim he

24  needed a money transfer.  The defendant returned to the desk,

25  acted like he was going to fill out that form.  Before he again

1   pulled the gun from his waistband and demanded the victim put

2   all the fucking money in the bag right now.  The victim emptied

3   two registers into a bag, a total of approximately $1,700.  And

4   again the victim within an hour gave a recorded statement to

5   the police as noted in Exhibit 4 of the government's sentencing

6   memorandum in which the victim stated he pulled it out,

7   referring to the gun, and steadied it on the counter aimed at

8   me.

9          Count Three.  On November 3rd, the defendant went

10  into -- this is now three days later.  So now over the course

11  of four days, we have three armed robberies, your Honor.

12  Tufts-Raymond entered the Shaw's Supermarket on Stafford

13  Street, entered again, went to the customer service desk,

14  pulled a gun from his waistband, racked the slide, and demanded

15  money.  And for this one, your Honor, this is a relatively

16  short video.

17         (Whereupon, the video was played.)

18         MR. GRADY:  There are two angles.  What the Court is

19  seeing now is a side angle.  And we'll see the defendant

20  wearing a read sweatshirt enter from the left.  At this point,

21  he's pulling the weapon.

22         For this video, I'm going to play for a few moments

23  further.  I think that one can -- though you can't hear it, one

24  can see the -- the victim's reaction, if one watches a few more

25  minutes.  Then it stops.

1          I'm just going to show the Court a second video from

2     the front now facing the defendant.

3          (Whereupon, the video was played.)

4          MR. GRADY:  We can clearly see the defendant

5     chambering a round in the weapon, preparing it to fire.

6          (Whereupon, the video was played.)

7          THE COURT:  Mr. Grady, I forgot from the PSR, what was

8     the caliber of the gun that was recovered?

9          MR. GRADY:  It was a Glock, your Honor, a .45 caliber.

10         THE COURT:  Thank you.

11         MR. GRADY:  I am going to make sure of that,

12    but -- yes, .45 caliber Glock handgun, your Honor.

13         So I don't think I need to say much more about the

14    November 3rd robbery.  I will say, your Honor, that having

15    reviewed this, you know, I really -- I watched this in an

16    attempt to sort of capture the same type of images in terms of

17    the gun.  So I watched both of these video extensively, and I,

18    you know, really tried to focus on where the gun was pointed.

19    This is one in which the government had succeeded in convincing

20    probation that the gun had been pointed at the victim.  I

21    couldn't find it here when I went through the videos, and I

22    ultimately concluded though it again doesn't have a practical

23    consequence, but for this the government is not objecting to

24    the five-level enhancement.  But having done that it

25    illustrated a point for me, which I would bring to the Court's

1    attention now is just part of the government's argument that as

2    useful as the sentencing guidelines are, and I don't think the

3    Court succumbed to this, but I think the Court in and just

4    discussing the issues regardless of how this is used, this is a

5    horrific experience for these victims that -- I watched these

6    over and over looking at whether the gun was pointed at the

7    victim.  And what I wasn't focusing on was the fact that the

8    defendant went into this victim's place of work, pulled a gun

9    out of his waistband, racked the slide in the victim's face and

10   demanded money, and it makes not one bit of difference whether

11   that counts as plus five or plus six under the guidelines in

12   terms of that victim.

13            So moving on to November 9th, the defendant committed

14   another armed robbery at the Shaw's Supermarket on West

15   Boylston Street.

16            Excuse me.  And again the defendant entered, went to

17   the customer service desk, pulled the gun from his waistband,

18   pointed it at the clerk and demanded that she give him all of

19   the money.

20            As the Court can see from Exhibit 5, again, this is

21   not a situation where the gun was merely waved around in some

22   sort of general threat.  This weapon was specifically leveled

23   at the young woman behind the desk.

24            (Whereupon, the video was played.)

25            MR. GRADY:  Just over a week later, the defendant

1    committed an armed robbery of the Gold Buyer's Jewelry Store on

2    Grafton Street in Worcester, your Honor.  The defendant was

3    buzzed in.  He engaged in some small talk with the employee

4    behind the counter.  This was not in a business that had

5    working video cameras, your Honor.  So all we have is the word

6    of the victim.  But the victim related that the defendant came

7    in and engaged in small talk, then pulled a handgun, racked the

8    slide in the victim's face, and demanded the money.

9            And as he walked out -- sorry.  What we're looking at

10   here actually in Exhibit 6 on the screen is the young woman

11   from the prior robbery.

12           Exhibit 7 is the Worcester P.D. report in which the

13   responding officer having spoken to the victim says, quote, the

14   victim said that the male pointed the gun at his face and told

15   him, quote, to give -- give him the money, and I don't want you

16   to watch me.  In addition to that statement to the police, upon

17   immediately responding again within approximately an hour of

18   the robbery, the victim gave a recorded statement to police in

19   which he stated that the defendant cocked the gun, and then

20   after getting the money from the victim walked backward towards

21   the door facing me with the gun pointed at me.

22           So again, though it is not material, it's the

23   government's position that the six-level enhancement is

24   appropriate.

25           On November 25th and then November 26th -- excuse me.

1    November 20th, your Honor, there was actually -- there was a

2    second robbery after the jewelry store.  The defendant then

3    went that same day, robbed a Citizens Bank, which was located

4    in a -- the supermarket at the Boston Turnpike in Shrewsbury,

5    and again we have the defendant pulling a firearm -- there's

6    really no question it's the defendant, as one can -- a

7    surveillance photo from the Citizens is particularly good, your

8    Honor.

9         This is the count that underlies both Count Six and

10   the charge of the use of a firearm in the course of a felony,

11   Count Nine, your Honor.

12        On November 25th, we have two more robberies, the

13   first at a Stop & Shop in Sturbridge, and again we have -- I

14   have just provided the Court with some surveillance.  Again,

15   you can see the defendant.  This is one in which probation

16   concluded, and I think the government at this point concurs,

17   that the weapon was not specifically pointed at the victim but

18   was instead merely displayed.

19        (Whereupon, the video was played.)

20        MR. GRADY:  And finally, we have the robbery or the

21   attempted robbery of the Worcester Credit Union on the

22   afternoon of November 25th, your Honor.  The defendant went in,

23   and this robbery really just didn't go according to plan.  The

24   defendant went in, pointed the gun at the teller, and the

25   teller reacted by simply falling to the ground, which is in

1    essence or essentially deprived the defendant of the ability to

2    threaten the victim.  It either was just incredibly smart or

3    incredibly lucky, but once the victim fell down, essentially

4    Mr. Raymond backed away from the counter.  He was actually

5    approached by a manager who asked what he was doing, and Mr.

6    Raymond turned to the manager and said, "I'm robbing you" but

7    at that point simply exited the bank.

8              And again there's really no question about the

9    identity of the defendant here, your Honor.

10             I would come back a little bit about the facts in the

11   robbery of the Sturbridge bank -- excuse me -- the Stop & Shop

12   that occurred -- that occurred in Sturbridge.  That's right.  I

13   do want to commend one witness actually followed this defendant

14   outside and got a partial plate, four digits of it, which were

15   relayed to police.  And on the 26th, the day after the two

16   robberies in Count Seven and Eight, an officer of the Spencer

17   Police Department observed three individuals getting into a car

18   that matched the description of the car and which matched the

19   description of the plate.  That officer called for backup and

20   initiated a stop.  The car fled.  When he was able to stop the

21   car there was only one of the three individuals in the car, an

22   individual by the name of Mr. Krystian Gubernat.  Mr. Gubernat

23   has been charged federally by a criminal complaint.  I would

24   anticipate his case to be similarly resolved, but it is not yet

25   at that stage, your Honor.

1          THE COURT:  Where is that?

2          MR. GRADY:  He is charged by way of criminal complaint

3     with two counts of bank robbery, two counts of use of a firearm

4     in the course of a felony.  His counsel and I have been in

5     discussions about a plea.  We're 99 percent the way there.  I

6     think truthfully what is holding that up at this point, I

7     think, Mr. Gubernat would like to see what sentence is imposed

8     in this court -- excuse me -- in this case.

9          Mr. Gubernat's role, he gave a confession, and I have

10    no evidence to the contrary was merely that he was the driver;

11    and, in fact, he confessed that he drove Mr. Tufts-Raymond to

12    and from the robberies.  And I think in one instance actually

13    he and his girlfriend did so.  But that gets a little bit

14    aside.

15         So at this point, when the officer stops the car with

16    only the single individual in it, officers were aware that this

17    is an individual who had committed eight robberies; and what

18    results essentially, your Honor, is what has been described as

19    a massive manhunt in downtown Spencer.  Obviously, it involved

20    a helicopter.  It involved canine units.  It involved state and

21    local police, dozens of officers.  Officers in that situation

22    are not bringing along a photographer, but the Worcester

23    Telegram did, in fact, come out there and took some photos,

24    your Honor, and I've included some of those photos for the

25    Court's review.  There are eight photos of the downtown Spencer

1    area.  One can see the helicopter, troopers confronting

2    individuals, troopers armed with assault rifles, multiple

3    police cars in the downtown area.  It doesn't convey the

4    entirety of the resulting search or how very deadly seriously

5    the police took this conduct, but I think it conveys a portion

6    of what occurred that day, your Honor.

7            So, in this case, your Honor, we have a plea agreement

8    pursuant to (c)(1)(B).  The Court is capable of imposing any

9    sentence, but the government's recommendation here is a

10   sentence of 180 months.  That consists of a sentence of 96

11   months on Counts One through Eight, your Honor, to be served

12   concurrently.  And as to Count Nine, which is the 924(c)

13   offense, your Honor, the mandatory minimum, a sentence of 84

14   months to run consecutively to those counts to the sentence

15   imposed on Counts One through Eight; a fine within the

16   guideline range, unless the Court determines the defendant is

17   unable to pay; a sentence of 60 months of supervised release,

18   which would consist of a sentence of 60 months on Count Nine

19   and a sentence of 36 months of supervised release on Counts One

20   through Eight to run concurrently; a special assessment of

21   $900.  Restitution is set forth in paragraph 143 of the PSR,

22   and forfeiture is set forth in paragraph nine of the plea

23   agreement.  There is a motion for final forfeiture pending at

24   Docket No. 46, your Honor.

25            Now, that aside, your Honor, I think the facts speak

1    for themselves a great deal in terms of some of the factors

2    under 3553(a), but just for clarity purposes, as the Court

3    found, we have a total offense level of 30, his criminal

4    history of four, which gives a guideline range of 135 to 168

5    months on Counts One through Eight, to which the 84-month

6    mandatory minimum must be added for a guideline range of 219 to

7    252 months.  So I'll begin by saying the government's

8    recommendation is below guidelines.

9         I -- the conduct here is incredibly serious, but the

10   government's recommendation does take into account that the

11   defendant has pled guilty before an indictment, has spared all

12   of the victims at trial, and has taken into account in essence

13   much of what the defendant conveys is mitigating circumstances,

14   such as his drug use for the motivation for the crime.

15        And I -- I mentioned to the Court already in terms of

16   discussing the guidelines how it is that sometimes they can

17   cause one to lose the forest through the trees, at least it did

18   for me a little bit, but these were horrific crimes, and I

19   think all the more so because this defendant it's not his first

20   armed robbery.  In fact, this defendant has a history of both

21   weapons possession and violent felonies beginning in 2006.  We

22   have what was essentially a conviction for disorderly conduct,

23   but when one looks a little bit deeper and looks at the facts

24   of that from the PSR, we see that he was found in possession at

25   the time of at double-bladed knife.

1          2007, we have a theft from a jewelry store where the

2   defendant goes in and simply grabs jewelry and runs out.

3          2008, the defendant's convicted of firearm possession,

4   of a .22 caliber revolver.  He is given probation and violates

5   and serves a year.

6          Then in a year in 2009 he's convicted of assault and

7   battery, and he's convicted -- he's given 18 months, though I

8   will say later in that same year he commits an armed robbery

9   with a knife, and that 18-month sentence I previously mentioned

10  is imposed concurrently with the two-year sentence he received

11  for the armed robbery.

12         And yet clearly his conduct continues.  So,

13  essentially, he has a pattern of escalating conduct.  You go

14  from disorderly to essentially unarmed robbery, to possession

15  of a firearm, to assault and battery, and to armed robbery.

16  And then we have an exponential in this case, your Honor, we

17  have eight armed robberies over a five-week period.

18         Looking then at the defendant's history and background

19  and the nature and circumstances of the offense, the government

20  suggests its recommendation of a 15-year sentence is not

21  entirely appropriate.  The defendant's history shows an

22  individual of escalating aggression and escalating danger.  The

23  defendant's conduct in this case is of the worse kind short of

24  murder.  The defendant essentially on eight separate occasions

25  set up a situation in which, you know, one bad choice by one

1    individual and the defendant would be charged with murder.  One

2    witness deciding to intervene or one individual behind a

3    counter deciding to grab for the gun, any of those things were

4    possible, and the defendant was perfectly willing to take those

5    risks.

6            So in terms of considering the seriousness of the

7    offense, and to provide for just punishment for the offense,

8    the government suggests the recommendation should be imposed.

9    Further, it would serve to deter this defendant, who in the

10   past has been arrested, has been convicted, has been

11   incarcerated, but whose behavior continues to escalate.

12           Further, while the Court should consider the

13   defendant's educational training and need for treatment, I

14   think the -- the defendant clearly has had the opportunity for

15   treatment before.  In fact, he has engaged in such treatment

16   before based on the letters you have before you, but each time

17   what we have is not a diminishment of his criminal conduct, but

18   an escalation.

19           Now, Judge, I don't have the sentencing transcripts

20   for his prior cases, but all we have today, to say this will be

21   any different is that his -- this time he's ready to commit,

22   but I would bet, and I don't have the transcripts, but I would

23   bet that exact same story has been told before when this

24   defendant was sentenced previously.  So we have a defendant

25   with prior weapons and armed robbery charges, incredibly

1    serious, potentially deadly conduct in this case, extraordinary

2    disregard for human life and the safety and the injuries to

3    others.  All of these factors, the government suggests

4    militates for the sentence of 180 months.

5         Even if we assume the defendant's narcotics addiction

6    contributes to these offenses, your Honor, this is not a

7    defendant who backslides and loses his job.  This is a

8    defendant who backslides and gets worse.  Treatment is not,

9    based on this defendant's history, going to alleviate the

10   problem.

11        THE COURT:  Did I -- did I read that the -- and I

12   think I did that the -- the weapon had hollow point bullets?

13        MR. GRADY:  Yes, your Honor, if we're looking -- a

14   picture of the gun and the bullets are Government Exhibit 2 in

15   the sentencing memorandum.

16        THE COURT:  Thank you.

17        MR. GRADY:  I'll just note a couple of things.  I'm

18   largely done, your Honor.  A couple of things from the

19   defendant's sentencing memorandum.  The defendant cites to two

20   cases in which defendants who were convicted of single counts

21   of bank robbery and single charges of 924(c) violations were

22   given, I think, respectively 14 years and ten-year sentences,

23   or something in that range.  You know, I actually pulled three

24   or four cases where defendants who committed one armed robbery

25   got 210 months.  I didn't find that to be particularly

1    persuasive, but if the Court does find it persuasive --

2         MR. MIRHASHEM:  I haven't been objecting, but I think

3    if the government is going to cite particular cases with

4    particular sentences, I need to have advance notice of that to

5    be able to respond to that case.  I mean I filed my memo with

6    the names of the cases.  I -- I certainly am not questioning --

7         MR. GRADY:  No.  No.

8         MR. MIRHASHEM:  -- Attorney Grady, but I'm not capable

9    of responding to I pulled a case where such and such a sentence

10   was imposed, your Honor.

11        MR. GRADY:  And that's sort of the government's point.

12   It's sort of kind of what I'm getting at, your Honor, that

13   picking these cases out of the blue and saying the

14   government -- you know, this case had 14 years.  Well, this

15   Court doesn't know anything about, you know, how the government

16   reached its recommendation, what the strength of the

17   government's case was, whether some negotiated plea was

18   reached, or some agreement was reached because there was issues

19   of suppression.  Looking at other cases in isolation with

20   whatever facts the defendant chooses to put before the Court

21   isn't all that helpful, but if the Court feels that that's

22   somehow compelling, I have a number of cases in which

23   defendants who have engaged in less serious conduct have

24   received larger sentences, but I would suggest it really

25   shouldn't be persuasive.

1          And to the extent it matters, that would be cases such

2     as *United States versus Cannon.*  That was a three-armed

3     robbery, three charges of armed robbery with no firearm charge,

4     your Honor.  The defendant received a 210-month sentence from

5     Judge Woodlock, Docket No. 11CR10335.  I could go on.  I

6     just -- I don't think it's that persuasive to look at these

7     other cases and try to drop parallels here, your Honor.

8          In terms of the need to provide restitution, I think,

9     your Honor, Probation has adequately set that forth in the PSR,

10    unless the Court is contemplating issuing something different,

11    the government would ask the Court to impose a sentence of

12    180 months as the government described it both earlier in its

13    argument and in its plea agreement.

14               THE COURT:  Thank you.

15               MR. GRADY:  Thank you.

16               THE COURT:  Attorney Mirhashem.

17               MR. MIRHASHEM:  Thank you, your Honor.  Your Honor,

18    there's no dispute that these were very, very serious offenses,

19    and the Court is going to impose a very, very severe sentence

20    in this case.  I mean he's an a 26-year-old young man.  He

21    served a one-year sentence and a two-year sentence.  If you

22    impose the eight years that we're asking for, that's four times

23    greater than the longest sentence that he has served.  If you

24    ask -- if you impose the 15 years that the government is asking

25    for it's more than seven times the longest sentence he has ever

1    served.  And so I do think that it's important to consider this

2    case in the context of other cases to avoid unwarranted

3    disparities.

4         Now one way I think the Court can certainly do that

5    is, you know, you're an experienced judge in state court, in

6    federal court certainly.  You're going to be weighing this case

7    relative to other cases that you've experienced.  And I agree.

8    I tried -- the sentencing statistics that are put out can't

9    capture the specific facts of cases in a way that allows

10   meaningful comparison of this case to a large number of other

11   cases.  I think it's different when you're talking about

12   possession of a certain amount of cocaine with intent to

13   distribute.  I mean, here it's harder.

14        I do think though that to avoid unwarranted

15   disparities, you need some markers, and one of the points of

16   the guidelines was to provide markers and avoid unwarranted

17   disparities, obviously.  But the guidelines, the Supreme Court

18   has said, are even presumptively reasonable in this case.  You

19   have to make an individualized determination under 3553(a), and

20   so I suggest that, you know, I put some effort into finding

21   these two cases.  I'm not suggesting that this was random on my

22   part, but I did make an attempt to find out about the facts of

23   the cases and the defendant's record.

24        Now, the government is correct.  I mean I don't know

25   what was discussed in the plea negotiations and stuff like

1  that.  That I do not know, but I do maintain that these two

2  cases provide helpful markers.  One of them is the *LePage* case.

3  So the conduct in that case is Mr. *LePage* walked into a bank,

4  grabbed a customer, stuck a gun to the back of the customer's

5  head.  He demanded that the customer hand over money, then

6  pointed the gun at the tellers and ordered them to put money in

7  the bag he was holding.  And he left with about $22,000.  His

8  record, I know, he's 48.  He had a criminal record spanning 33

9  years that included a conviction for murder where he got 18 to

10 20 years; armed robbery where he got a concurrent 21 to 22

11 years; a separate assault to kill where he got a separate five

12 to ten years; and a separate armed robbery where he got a

13 separate five to 10 years.  Mr. LePage was subject to a seven

14 year mandatory sentence for brandishing.  And the parties

15 agreed on a 16-year recommendation with Judge Stearns, not a

16 judge known for being particularly lenient, he adopted.  So 16

17 years for somebody who already had a murder conviction and two

18 prior armed robberies, five to ten cases.

19        The other one is the Hamilton case, which I cited

20 which is Judge Zobel's case.  The defendant robbed a Citizens

21 Bank by passing a note to the clerk.  As he's leaving the bank

22 he -- I note that he has a gun.  As he's leaving the bank he

23 gets trapped inside the bank.  He pulls out his gun and

24 actually discharges it five times as he's yelling, and that

25 causes the bank employees to open the door so he can get out.

1   He was a career offender.  So his guideline range was 308 to

2   355 months, including the 10 year mandatory for a discharge.

3   And he got a total of 14 years, a total 10 plus four.

4          I do think that these are two cases where the conduct

5   was worse.  The record was much worse.

6          Now, what you have in this case, which you didn't have

7   in those cases is the crime spree.  You have over -- about a

8   three-week period eight of these incidents, and I agree that

9   that's something that gets factored on the other side.  I mean

10  I think if he had done one of these, I think he clearly would

11  have been appropriate for a substantially shorter sentence.

12  But he did eight of them, and that is more serious, but I just

13  ask the Court to consider that -- I mean again, you're an

14  experienced judge.  You have seen a lot of cases where somebody

15  who is feeding a drug habit goes on a crime spree; and whether

16  they get arrested after the first one, second one, fifth one,

17  or 50th one, whether it's shoplifting -- I mean we have all

18  seen so many cases of drug addicts who shoplift.  You can hit

19  three supermarkets or 30 of them.  It's a matter of

20  happenstance how many you do because you know what you're doing

21  is you're going to commit the crime, use the money, the next

22  day you need more money to feed your habit.  And so the eight

23  is a significant factor for the Court, but I do think that even

24  with eight when you compare it with, you know, a die-hard

25  criminal, who has served a murder sentence, two prior armed

1    robbery sentences, points a gun in the back of the head of a

2    customer that he has grabbed, if that person gets 16, then this

3    person deserves less than the 15 that the government is asking

4    for.

5           Now, the other point that I want to make sort of

6    generally is I've cited at the beginning of my memorandum, I

7    think it's important for the Court to recognize that you have

8    to fashion an overall sentence that's appropriate in this case.

9    You -- it shouldn't be, well, he is getting seven years for the

10   gun count.  Well, I'm not going to give him just one year for

11   the robbery.  I've cited a Fifth Circuit case that makes it

12   very clear that, you know, in the fraud context, Congress has

13   said you get a two year consecutive sentence to the underlying

14   fraud for identity theft and instruct the judges not to

15   consider those two years in deciding a sentence for the

16   underlying offense.  That's not the case here.  The entire

17   sentence that you impose has to be an appropriate one whether

18   it's 15, or eight, or somewhere in between, and that I think is

19   a very --

20          THE COURT:  I'm wrestling with that.  I agree with

21   you.  That is a problem because -- well --

22          MR. MIRHASHEM:  And you know, I think the reason it's

23   a problem is I mean, frankly, I don't agree with it, but you

24   know, I'm obviously -- they don't listen to me.  Congress has

25   made a decision here how much power to vest in federal

1    prosecutors, and one of the reasons for the enormous explosion

2    of, you know, incarceration length and numbers over the past 30

3    years from 200,000 in the 1970s to 2 million in the 2000s is

4    state legislation has also followed and invented enormous

5    discretion in prosecutors in terms of the definition of

6    offenses and specifically minimum mandatory sentences.  I very

7    much appreciate that Attorney Grady in this case, you know,

8    charged one count.  He could have charged two counts, and then

9    it would have been a minimum mandatory 25 years.

10            MR. GRADY:  Thirty-two.

11            MR. MIRHASHEM:  Thirty-two.  But that's a decision

12   that Congress made to give him the discretion to decide whether

13   to force you to put this man away for life or not.

14            THE COURT:  And this is a lot more academic than

15   practical what I'm about to say, but following that line of

16   reasoning I would -- I should start with the sentence of

17   168 months because it's 84 and 84.  I mean isn't that what

18   you're saying?

19            I mean the seven years is there so in order to make

20   the sentencing -- the sentences not disparate, he should be

21   getting at least that much on the front end.  I mean that

22   doesn't work.

23            MR. MIRHASHEM:  No, no, he -- Congress has said that

24   he can't get less than seven.

25            THE COURT:  Right.

1      MR. MIRHASHEM:  Congress has also said in 3553(a) that
2   you've got to come up with a total sentence of at least seven
3   that is appropriate for the entire conduct in this case.  Eight
4   robberies that involved firearms, what's the right sentence in
5   your judgment, except that you can't give him less than seven?
6   I think that that is what I'm saying that you've got to give
7   him at least seven, but what you shouldn't do is say, okay, I'm
8   going to put the seven aside and decide, you know, how much to
9   give him for the robberies.  You have a 24-year-old individual
10  before you.  He has done a one-year sentence and a two-year
11  sentence.  And one consideration, for example, the specific
12  deterrence.  You, I'm sure, want to make sure this person
13  doesn't do this again.  He has got to get a big enough sentence
14  that he gets the message not to do it again, and for that I
15  suggest -- this is where it makes a difference.  I mean you
16  give him eight years.  He's 24 with a six-year-old daughter,
17  and very close to a grandmother who is very elderly.  I mean
18  putting him away for eight years is not going to give him the
19  message of, oh, you know, why don't you just go out and rob
20  more banks because all you got is eight years.  He is going to
21  spend the prime of his life in prison, away from his
22  grandmother, away from his parents, away from his daughter.
23  And so that's a sufficiently severe sentence.
24      The other factor that I've brought out in my
25  memorandum and I ask the Court to consider is his history and

 1   characteristics.  I mean, frankly, in all honesty, I don't know

 2   how judges do their job because I always struggle with -- I

 3   mean, clearly he's coming to this Court and pled guilty so the

 4   law holds him responsible for his conduct despite the fact that

 5   I know that if my child had this kind of upbringing it's quite

 6   likely that he would do it.  I mean it really raises some

 7   important questions about free will and choice; and if you're

 8   in the mental hospital when you're six years old and, you know,

 9   the GAL has interviewed you five times about cross allegations

10   that your parents are making and you're addicted to drugs by

11   the time you're 15, and you're using every day by the time

12   you're 20, I mean at least you don't get a free pass on that.

13   That's very clear.  But Congress has set out these factors, and

14   the first one includes the history and characteristics of the

15   defendant, and a lot of this fighting over what weight to give

16   the guidelines was about a commission that basically was

17   saying, oh, don't look at these factors, just look at the

18   numbers which -- as Attorney Grady described don't capture the

19   facts of the case, don't capture the background of the

20   defendant.  Well, now the Supreme Court has said, you can't do

21   that.  You should consider in this case, you know, what

22   happened to this person when he was three.  You should consider

23   what happened to him when he was six or seven and somehow weigh

24   that in; and as I understand it, the way that it comes in is

25   you can't go easy on specific deterrence because he had a

1    difficult childhood because you have to make sure he doesn't do

2    this again.  You can't go easy on general deterrence because he

3    had a difficult childhood because everybody else out there has

4    got to get the message not to do this.  But you can go easy, I

5    think, in a big part of sentencing which however -- whatever

6    language you use, I mean I could just tell from your reaction

7    to the images in this case you want to say you have engaged in

8    some really wrongful conduct, and for that you deserve to be

9    punished.  And I think it's when you consider this matter of

10   just deserved, how much does someone deserve as punishment?

11          There, I think, you do have to look closely at the

12   human being that is before you.  I mean the guy who had all the

13   privileges and had a wonderful two-parent family and went to

14   the private school and went to Harvard, and then went out and

15   in a -- you know, a moment of anger driven by, like,

16   selfishness, or whatever, hurt somebody.  Well, that's

17   different from the person who struggled from like infancy

18   basically.

19          And you have before you someone who has struggled

20   literally since infancy, and the trauma and hurt that he

21   experienced caused him to become addicted to drugs, and that

22   addiction caused him to engage in this conduct.  And so those

23   things, I do ask you to consider, but I also understand that

24   while you've got to protect the public so you can't just go by

25   that.  So what are this person's prospects?  And the letters

1    that I've enclosed from his treatment providers, I think, show

2    that this is an individual who has excellent prospects if he

3    can deal with his addiction issue, and the letters show that in

4    the past he has really succeeded for not lengthy periods of

5    time, brief periods of time.  But I was frankly, you know, very

6    pleasantly surprised by these letters.  I mean these are people

7    who deal with people like Jonathan every day, and, you know,

8    when you have the lead case manager at Star saying over the

9    past three years I have watched Jonathan fight his way back

10   from seemingly insurmountable odds and time and time again

11   display constant vigilance and great fortitude.  He has been

12   able to secure employment, addresses most pressing issues, and

13   tries to become a productive member of society.

14          You have the YARCAM program talking about how he was

15   fully engaged in his addiction and mental health treatment, how

16   he worked hard at having reconciliation goals.  I mean I think

17   this is someone who treatment providers saw some promise in,

18   and that is a factor to also consider in deciding just how long

19   do you need to lock him up to protect society.

20          And I just -- I mean I just hope I can convey to you

21   that, you know, eight years is a very long time for someone

22   like this who has a six-year-old, an elderly grandmother, has

23   never been incarcerated for more than two years.  Eight years

24   is a very long time, and it is a fair and just sentence in this

25   case, your Honor.

1          And if you permit him, Jonathan would like to make a

2    statement as well.

3          THE COURT:  Thank you.  Thank you.

4          Would you like to address me before I impose sentence

5    on you, Mr. Tufts-Raymond?

6          THE DEFENDANT:  Yes, Judge.

7          THE COURT:  Please do.

8          THE DEFENDANT:  Please.  I want to just thank you for

9    letting me speak.  I want to take this opportunity to apologize

10   to the Court, who must decide my punishment, the victims of my

11   crimes in this case, and also my family.

12         Your Honor, when I think of the fear that I caused the

13   victims in this case, they experienced from my selfish acts,

14   I'm completely ashamed of myself.  I would like nothing more

15   than to go back and take back my actions.

16         I'm so sorry that these hard-working people suffered

17   from my disgusting behavior, and as I stand here before you

18   sober and a stable state of mind, it makes me sick to my

19   stomach to see what these people went through on my behalf.

20         I'm barely able to put in words how genuinely sorry I

21   am for these victims in this case.  Although the monetary

22   victims are the institutions named, the true victims are the

23   people that I put in fear and traumatized, and I pray that they

24   can heal.

25         I'm not an actually evil person, Judge.  I'm a -- for

1   a long time in my life I've struggled with substance abuse

2   problems and the disease of addiction, and I want to just point

3   out that this is in no way an excuse for my behavior.  I'm just

4   trying to alert the Court to my state of mind during the

5   commission of these crimes.

6          I would also like to apologize to my family.  My

7   selfish acts have not only taken my freedom away, but I've

8   taken away from them a son, a grandson, and most tragically a

9   father to my daughter.  She deserves a good father, and I have

10  taken that from her as well.

11         Your Honor, I can't -- I'm the only one that can fix

12  myself.  I'm responsible for my own recovery.  I know it starts

13  with me.  And my failed attempts in the past have shown me that

14  I need to do something greater and something more important.

15  And I know I am eligible for the RDAP Program, which

16  specializes in helping addicts conquer their addiction to drugs

17  and alcohol.  And I will complete the RDAP Program, and with

18  help from my family, I'll have a strong recovery-based network

19  in place for when I'm released.

20         I want to thank you again for letting me speak.

21         THE COURT:  Thank you.  Well done.

22         THE DEFENDANT:  Thank you.

23         THE COURT:  And I want to thank both lawyers.  It's

24  not often that I get to say this.  You guys were both

25  informative and eloquent, and it was appreciated.

1          All right.  Mr. Tufts-Raymond, if you could stand up,

2     please.

3          In considering what a reasonable sentence would be

4     here, I must consider and have considered the advisory

5     sentencing guidelines, the nature and circumstances of your

6     crimes, your personal and criminal history and characteristics

7     and the need for the sentence to reflect the seriousness of the

8     offense, to promote respect for the law, and to provide just

9     punishment and adequate deterrence.

10          So pursuant to the Sentencing Reform Act of 1984, and

11     having considered the sentencing factors enumerated in

12     18 United States Code, Section 3553(a), it is the judgment of

13     the Court that the defendant, Jonathan Tufts-Raymond, is hereby

14     committed to the custody of the bureau of imprison -- Bureau of

15     Prisons to be imprisoned for a term of 135 months.

16          That terms shall consist of terms of 51 months on

17     Counts One through Eight to be served concurrently, and a term

18     of 84 months on Count Nine to be served consecutively to the

19     terms imposed on Counts One through Eight.

20          I'm recommending participation in the Bureau of

21     Prisons Residential Drug Abuse Program due to your substance

22     abuse history and based on the informal screening performed by

23     the probation office.

24          Upon release from prison, you shall be placed on

25     supervised release for a term of three years.  That term shall

1    consist of three years on Counts One through Five and

2    terms -- and three years on Counts Six, Eight, and Nine to run

3    concurrently.  Within 72 hours of release from the Bureau of

4    Prisons, you shall report to the district in which you are

5    released.

6         In addition, you shall make restitution in the amounts

7    as indicated by the United States Attorney's Office, and any

8    payment that is not paid in full shall be divided

9    proportionally among the parties named.  Restitution shall be

10   paid by the defendant jointly and severally with any other

11   person convicted in the instant offense who is and may be

12   ordered to pay restitution.

13        In addition to the mandatory terms of condition, you

14   are prohibited from possessing a firearm, destructive device,

15   or other dangerous weapon.  You are to pay the balance of

16   restitution according to a court ordered payment schedule.  I

17   am not imposing a fine, as I find you have no present ability

18   to pay such.  You are prohibited from incurring new credit

19   charges or opening addition lines of credit without the

20   approval of the Probation office.  You are to provide the

21   Probation office access to any requested financial information,

22   which may be shared with the financial litigation unit of the

23   United States Attorney's Office.

24        You are to participate in a program for substance

25   abuse counseling as directed by the Probation office.  You are

1    to participate in mental health treatment as directed by

2    Probation as well.

3              It is further ordered you shall pay to the United

4    States a special assessment of $900, which shall be due and

5    payable immediately.

6              Assuming that your -- any appellate rights that you

7    have survive your appeal waiver, you also have a right to

8    appeal your sentence, particularly if you think it was contrary

9    to law.  If you are unable to pay the costs of appeal, you may

10   ask permission to have those costs waived and appeal without

11   paying.

12             You must file any notice of appeal within 14 days

13   after the entry of judgment; and if you request, the clerk

14   may -- will immediately prepare and file a notice of appeal on

15   your behalf.

16             Mr. Grady, anything further?

17             MR. GRADY:  I would just have the Court direct that it

18   would order forfeiture of the firearm and ammunition.

19             THE COURT:  Yes.  So ordered.  Thank you.

20             Mr. Mirhashem, anything further?

21             MR. MIRHASHEM:  No, your Honor.

22             THE COURT:  Good luck to you, sir.

23             THE DEFENDANT:  Thank you, your Honor.

24             THE COURT:  Make this work.

25             THE DEFENDANT:  Thank you, your Honor.

1          THE COURT:  All right.  We're in recess.

2          (At 4:46 p.m., Court was adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4     certify that the foregoing transcript is a true and accurate

5     transcription of my stenographic notes before the Honorable

6     Timothy S. Hillman, to the best of my skill, knowledge, and

7     ability.

8

9

10        /s/ Marianne Kusa-Ryll                    3/26/15

11        Marianne Kusa-Ryll, RDR, CRR              Date

12        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25